FORESTER, Appellant,

v.

OHIO DEPARTMENT OF HUMAN SERVICES, Appellee.

[Cite as *Forester v. Ohio Dept. of Human Serv.* (1997), 122 Ohio App.3d 750.]

Court of Appeals of Ohio,
Fourth District, Meigs County.

No. 96CA24.

Decided Sept. 22, 1997.

*Southeastern Ohio Legal Services* and *Anne Sessums Rubin*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Christopher T. Carlson*, Assistant Attorney General, for appellee.

STEPHENSON, Presiding Judge.

This is an appeal from a judgment entered by the Meigs County Court of Common Pleas affirming a decision and order of the Meigs County Department of Human Services Hearing Authority disqualifying Mary Forester, appellant herein, from participation in the food stamp program for a period of six months. Forester assigns the following error for our review:

I. "The trial court erred [in] adopting the appellee's proposed decision and entry when the county human services department did not prove clearly and convincingly that the appellant intended to commit an intentional food stamp program violation."

Mary Forester was the "primary information person" for a food stamp assistance group consisting of Forester, Forester's disabled husband, and the couple's children and stepchildren. On June 18, 1992, Forester executed a required semiannual eligibility reapplication form which indicated that Forester's family, *i.e.*, her "assistance group," had no earned income.

On June 25, 1992 Forester's daughter Loretta, a member of Forester's assistance group, became employed. On December 17, 1992, Forester executed a reapplication form, which once again indicated that Forester's assistance group had no earned income. Subsequently, the Meigs County Department of Human Services [1] ("CDHS") discovered that Forester's daughter had earned $3,317.11

---

1. Appellee, Ohio Department of Human Services, administers the food stamp program at the state level. CDHS administers the program locally.

while residing in Forester's household, resulting in a food stamp overissuance of $727.

On May 5, 1995, Forester was mailed a Form DHS 4026, "Waiver of Administrative Disqualification Hearing," advising her that CDHS was accusing her of an intentional food stamp program violation, based upon her failure to report employment and earned income of a member of her assistance group.

An administrative disqualification hearing was held, via telephone, before a hearing officer of the Ohio Department of Human Services on August 10, 1995. The following day, August 11, 1995, the hearing officer issued a recommendation that CDHS's determination, that Forester had committed an intentional program violation, be upheld. The hearing authority adopted the hearing officer's recommendation, issuing a final administrative decision and order disqualifying Forester from the food stamp program for six months.

On September 8, 1995, Forester filed a timely notice of appeal to the Court of Common Pleas of Meigs County. Following receipt of briefs, the trial court, on September 19, 1996, filed a proposed decision and entry affirming the decision of the Department of Human Services. Forester filed notice of the instant appeal on October 21, 1996.[2]

■ On appeal from a judgment of an administrative agency, the court of common pleas is limited to determining whether the judgment is supported by reliable, probative, and substantial evidence and is in accordance with law. R.C. 119.12; *Kennedy v. Marion Correctional Inst.* (1994), 69 Ohio St.3d 20, 21–22, 630 N.E.2d 324, 325–327; *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748, 750–751; *Wright v. Ohio Dept. of Human Serv.* (Mar. 26, 1993), Washington App. No. 92CA15, unreported, 1993 WL 97791. Our review is more limited than that of the trial court. We determine only whether the trial court has abused its discretion.[3] *Kennedy, Pons,* and *Wright, supra.*

In the instant case, Forester does not dispute that an overissuance occurred or that the overissuance must be repaid. Rather, Forester disputes the determination regarding her culpability, *i.e.,* Forester argues that the overissuance was

---

2. On November 18, 1996, the court of common pleas filed a *nunc pro tunc* entry reflecting that the court's prior entry was a final, appealable order.

3. We acknowledge *Brown v. Ohio Bur. of Emp. Serv.* (1994), 70 Ohio St.3d 1, 635 N.E.2d 1230, wherein the Ohio Supreme Court inexplicably deviated from its prior course by phrasing the issue as whether the common pleas court's decision was supported by reliable, probative, and substantial evidence. Although the Ohio Supreme Court apparently utilized the same standard of review as the common pleas courts, the court did not overrule any of its previous decisions holding that our standard of review in R.C. 119.12 cases is abuse of discretion. In any event, the result we have reached herein is the same under either the abuse-of-discretion standard or the standard enunciated in *Brown.*

attributable to household inadvertence as opposed to an intentional program violation.[4] Specifically, Forester argues that the Department of Human Services failed to prove, by clear and convincing evidence, that the overissuance resulted from an intentional program violation.

The standards for determining whether an individual has committed an intentional program violation are set forth in Section 273.16(c), Title 7, C.F.R., which provides, in part, as follows:

"[I]ntentional Program violations shall consist of having *intentionally:* (1) Made a false or misleading statement, or misrepresented, concealed or withheld facts, or (2) committed any act that constitutes a violation of the Food Stamp Act, the Food Stamp Program Regulations, or any State statute relating to the use, presentation, transfer, acquisition, receipt, or possession of food stamp coupons or ATP's." [5] (Emphasis added.)

The intent to commit an intentional program violation must be proven by clear and convincing evidence. Section 273.16(e)(6), Title 7, C.F.R. provides:

"The hearing authority shall base the determination of intentional Program violation on *clear and convincing evidence* which demonstrates that the household member(s) committed, and *intended* to commit, intentional Program violation as defined in paragraph (c) of this section." [6] (Emphasis added.)

■ While we believe that the evidence in the record clearly and convincingly establishes that an overissuance occurred, we find that the evidence is insufficient, as a matter of law, to meet CDHS's heavy burden of establishing, *by clear and convincing evidence,* that Forester *intended* to commit an *intentional* Program violation.

At the disqualification hearing, CDHS called a single witness, Dan Tobin, a CDHS social program administrator. Tobin testified as follows:

"The statement of facts on this case are that on June 18th, 1992 Mary Forester completed a redetermination application. Among her household members was her daughter, Loretta Smith.

---

4. Both the Code of Federal Regulations and the Ohio Administrative Code provide for three types of food stamp overissuance claims: (1) inadvertent household errors, (2) administrative errors, and (3) intentional program violations. Section 273.18(a), Title 7, C.F.R.; Ohio Adm.Code 5101:4–8–15.

5. See, also, Ohio Adm.Code 5101:6–20–02.

6. See, also, Ohio Adm.Code 5101:6–20–16(C)(1)(c), which provides:
"It shall be the responsibility of the local agency to show, by clear and convincing evidence, that the accused individual committed intentional program violation."

"On June 25th, 1992, Loretta Smith became employed by The Kroger Company. This employment was not reported to the Meigs County Department of Human Services.

"On December 17th, 1992, Mary Forester completed a redetermination interview, failed to—she continued to fail reporting Loretta Smith's employment, and an IVES match was received. A gross earned income of $3,317.11 was received by Loretta Smith from the date her employment began until she left Mary Forester's household.

"Mary Forester stated she reported Loretta Smith's employment when she became employed to this agency and that she also told Loretta to report her income. The failure of Mary Forester to report the earned income and employment of Loretta Smith resulted in a food stamp overpayment of $727.

"On May 5th, 1995, an ODHS 4026 was mailed to Mary Forester.

"On May 8th, 1995, Mary Forester telephoned this agency regarding this form. She said that she reported when Loretta Smith became employed but admitted she reported no changes during a subsequent redetermination interview. On June 8th, 1995, Mary Forester telephoned this agency, said she had a problem with the word 'intentional' and would not be signing the waiver.

"Let's see. Basically, Loretta Smith became employed on June 25th, '92, and this employment was never reported to the Meigs County Department of Human Services and it was discovered through an IVES match.

"That's basically it, except for the exhibits * * *.

"* * *

"I have nothing else to add at this time. Basically, what we have is, you know, a situation that has occurred and, you know, Mary says she reported it, but we have no record of that."

In addition to Tobin's testimony, CDHS submitted nine exhibits, consisting of (1) a one-page agency-generated claim report, undated; (2) a twenty-nine-page June 18, 1992 redetermination application signed by Forester; (3) a one-page notice of verification/penalty warning dated June 18, 1992 and signed by Forester; (4) a twenty-five-page December 17, 1992 redetermination application signed by Forester;[7] (5) a one-page notice of verification/penalty warning dated December 17, 1992 and signed by Forester; (6) wage and employment verification information for Loretta Smith consisting of four pages; (7) a one-page statement

---

7. This reapplication form, as well as the June 18, 1992 form, appears to have been computer-generated. Aside from the signatures on the final page, the entire form, including all questions and responses contained therein, is in a uniform typeface, indicating that the form was physically completed by a CDHS representative, not Forester.

dated April 4, 1995 and signed by Forester;[8] (8) seven pages of "RUNNING RECORD COMMENTS," which appear to be CDHS computer entries, covering the period June 5, 1992 through September 7, 1993; and (9) a "Waiver of Administrative Disqualification Hearing" form, dated May 5, 1995.

Forester, who was unrepresented at the hearing, presented no exhibits, but did testify on her own behalf. Forester testified that she called CDHS when her daughter began working and was informed that the agency would need to be provided with a copy of her daughter's first paycheck. Forester subsequently spoke with her daughter on three occasions regarding the matter and was assured each time that a copy of her daughter's check had been provided to CDHS. Forester further testified that she could not recall whether she was actually asked at her December, 1992 reapplication interview if her daughter was employed. All she recalled was being asked if anything in the household had changed. Believing that the agency was already aware of her daughter's employment, Forester replied that nothing had changed.

Based upon the forgoing evidence, the hearing officer found:

"Facts indicate the appellant completed a food stamp reapplication interview on December 17, 1995 [*sic*]. The application signed by the appellant indicates the appellant answered 'no' to the specific question in regards to whether the appellant's daughter was currently employed (page 15 of exhibit 4).[9] The agency became aware of the employment/income through data match. It is the judgement of the hearing officer that this false and misleading statement given to the agency and signed by the appellant in the reapplication on December 17, 1992, is clear and convincing evidence that the appellant has committed and intended to commit an intentional program violation."

The trial court affirmed, finding that "the testimony presented was reliable, substantial and probative enough to satisfy Ohio Adm. Code 5101:6–20–16 as was the documentary evidence."[10] We disagree.

---

8. This statement provides as follows:

"This statement has been written for me by fraud investigator Don L. Snyder. I recall that Loretta Smith (my daughter) was working at Krogers. I know that I reported this to my caseworker, and I know that I told Loretta to report her income to our caseworker.
"Loretta was part of my food stamp case.
"I have read this statement and I swear to the truth of it."

9. The form provided as follows in regard to Forester's daughter:

"Is this person currently employed or on strike? No.
"Is this person self-employed? No.
"Has this person had previous employment in the last 4 1/2 years? No."

10. Ohio Adm.Code 5101:6–20–16(C) provides, as follows:

Proof of affirmative misrepresentation is not necessary to establish an intentional program violation. Failure to report earnings (sans affirmative misrepresentation), if proven by clear and convincing evidence to be an intentional concealment or withholding of facts, would constitute an intentional program violation. By definition, however, not every failure to report earnings is an intentional program violation. See *Smith v. Dept. of Health & Rehab. Serv.* (Fla.App. 1 Dist.1988), 522 So.2d 956, 959. ("Mere failure to report income does not establish by clear and convincing evidence that there was intent to commit an intentional program violation.") Thus, to establish an intentional program violation, CDHS was required to show more than a simple failure by Forester to report earnings.

One of the most direct ways to establish an intentional program violation would have been to show an affirmative misrepresentation, *i.e.*, to prove that Forester consciously lied at the December 1992 interview about her daughter's employment status. If Forester had lied, CDHS could easily have established this through the affidavit or testimony of the case worker who conducted the interview or, perhaps, by presenting evidence as to the manner in which the form would have been completed at the time of the interview. See, *e.g.*, *Frank v. Ohio Dept. of Human Serv.* (1996), 110 Ohio App.3d 86, 673 N.E.2d 653[11]; *Jones v. Ohio Dept. of Human Serv.* (Nov. 29, 1995), Allen App. No. 1–95–42, unreported,

---

"(1) The hearing officer's findings of fact shall be based exclusively on the evidence introduced at the hearing * * *.

"(a) The hearing officer may be guided, but shall not be bound, by the 'Ohio Rules of Evidence' in conducting hearings and in making findings of fact. The hearing officer shall consider all relevant evidence offered at the hearing.

"(b) Hearsay evidence may be considered by the hearing officer in arriving at the findings of fact. However, such evidence must be critically evaluated, since it is not given under oath and cannot be cross-examined to test the perception, memory, and veracity of the declarant.

"Direct evidence shall normally be given more weight than hearsay evidence when the two are in conflict. Whenever possible, the hearing officer shall avoid basing a finding of fact solely on hearsay evidence."

**11.** In *Frank*, the Third District Court of Appeals wrote:

"On February 14, 1994, appellant reapplied to the food stamp program. The application contained the question, 'Is anyone in your household employed?' *Ms. Frank answered, 'No.'* Appellant was again informed of her reporting obligations and the penalty for failing to report family income." (Emphasis added.)

It is not clear from the *Frank* opinion whether the court determined that "Ms. Frank answered 'No.'" merely because the face of the reapplication form reflected this response (it is also not clear whether the "No" response appears in computer typeface or Frank's handwriting) or whether Frank admitted at the hearing that she had made the response reflected in the application, or whether the determination was based on testimony from the agency representative that it is the agency's practice to go over each and every question on the reapplication form with each and every applicant. In the case *sub judice*, the *only* evidence before the hearing officer going to this precise factual issue was the computer-generated form itself, which was *not* completed by Forester (see fn. 7, above).

1995 WL 705216. CDHS did not do so. CDHS presented no evidence whatsoever regarding Forester's December 17, 1992 reapplication interview and/or execution of the reapplication form. Neither did CDHS present any evidence of CDHS's standard application procedure that would tend to show that the subject of Forester's daughter's employment would have actually been addressed at the interview. Forester was not even asked at the hearing if she read the reapplication form before signing it.

The fact that Forester signed a lengthy, computer-generated form prepared by a CDHS representative simply does not, without more, clearly and convincingly establish that she was aware of each and every item in the form or that she affirmatively, *intentionally* misrepresented to CDHS via the form that her daughter was not employed. To be sure, signing such a form without carefully reviewing it in its entirety would be extremely imprudent. Such imprudence does not, however, amount to intentional misconduct.

Because we find very little, if any, evidence in the record probative of the issue of whether Forester acted intentionally, we find that the trial court abused its discretion in affirming the decision of the Department of Human Services.[12] Accordingly, Forester's sole assignment of error is sustained, and the judgment of the trial court is reversed.

*Judgment reversed.*

PETER B. ABELE, J., concurs in judgment only.

HARSHA, J., dissents.

HARSHA, Judge, dissenting.

I admit that my heart is with the majority, but my concept of the standard of review at work in this case keeps me from joining their efforts to reach "the right result." While the principal opinion artfully frames its analysis in terms of "as a matter of law," this appeal really presents an abuse-of-discretion issue. This distinction is outcome-determinative in my mind, for if we were in a position to make a *de novo* review of the facts, I would not hesitate to join my colleagues in reversing this judgment. However, since I believe we are much more limited in our review by the abuse-of-discretion standard set forth in *Kennedy, supra*, I cannot second-guess both the agency and the trial court. I readily concede that trial courts should not be permitted to reach the wrong legal conclusion on a question of law and yet pass muster under the highly deferential abuse-of-discretion standard. To me, a prejudicial error of law always amounts to an

---

**12.** Likewise, we find the decision of the trial court to be erroneous under the *Brown* standard. See fn. 3, above.

abuse of discretion, holdings to the contrary notwithstanding. However, because I find that the record contains some evidence which would allow the agency to infer that the misrepresentation was intentional, *i.e.*, that she knowingly signed a written document, I cannot say that the decision of the trial court was wrong as a matter of law. While I would like to join the majority, I feel constrained to defer to the wisdom of the trial court.